## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **EVERGREEN MEDIA HOLDINGS, LLC, TONY DEROSA-GRUND,** and **GERALD D. BRITTLE** § § § § | **CIVIL ACTION NO. 4:14-CV-1117** |
| **VS.** § § § § | **JURY DEMANDED** |
| **LORRAINE WARREN, TONY SPERA, GRAYMALKIN MEDIA, LLC, NEW LINE PRODUCTIONS, INC.,** and **WARNER BROS. ENTERTAINMENT, INC.** § § § § § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs, EVERGREEN MEDIA HOLDINGS, LLC, TONY DEROSA-GRUND AND GERALD D. BRITTLE, complain of Defendants, LORRAINE WARREN, TONY SPERA, GRAYMALKIN MEDIA, LLC, NEW LINE PRODUCTIONS, INC., and WARNER BROS. ENTERTAINMENT, INC., as follows:

### Parties

1.      Evergreen Media Holdings, LLC, is a Texas limited liability company with its principal place of business in Montgomery County, Texas.

2.      Tony DeRosa-Grund is an individual residing in Montgomery County, Texas.

3.      Gerald D. Brittle is an individual residing in Richmond, Virginia.

4.      Lorraine Warren is an individual who may be served with process at 30 Knollwood Street, Monroe, Connecticut 06468, or wherever she may be found. Mrs. Warren has transacted business in and/or purposefully directed her acts toward the Southern District of Texas.

5.     Tony Spera is an individual who may be served with process at 122 Mine Hill Road, New Milford, Conecticut 06776, or wherever he may be found.   Mr. Spera has transacted business in and/or purposefully directed his acts toward the Southern District of Texas.

6.     Graymalkin Media, LLC is a California limited liability which may be served with process by serving its principal, David Zindel, at 1413 Greenfield Avenue, Suite 103, Los Angeles, California 90025, or wherever it may be found.  The company transacts business in, has transacted business in, and/or has purposefully directed its acts toward the Southern District of Texas.

7.     New Line Productions, Inc. is a California corporation which may be served with process by serving its registered agent, CT Corporation System, at 818 West Seventh Street, 2nd Floor, Los Angeles, California 90017, or wherever it may be found.  The company transacts business in, has transacted business in, and/or has purposefully directed its acts toward the Southern District of Texas.

8.     Warner Bros. Entertainment, Inc. is a Delaware corporation which may be served with process by serving its registered agent, CT Corporation System, at 818 West Seventh Street, 2nd Floor, Los Angeles, California 90017, or wherever it may be found.  The company transacts business in, has transacted business in, and/or has purposefully directed its acts toward the Southern District of Texas.

## Jurisdiction and Venue

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1338(a) (acts of Congress relating to patents, trademarks and copyrights), 28 U.S.C. §§ 2201, *et seq.* (declaratory judgment act) and 28 U.S.C. § 1367

(supplemental jurisdiction over state claims).  This Court also has jurisdiction pursuant to federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

10.     Personal jurisdiction over the non-resident Defendants is proper because this lawsuit: (i) arises from acts and/or transactions occurring within and/or directed towards Texas; (ii) is connected with acts and/or transactions occurring within and/or directed towards Texas; and/or (iii) relates to the purposeful acts and/or transactions of the non-resident Defendants, and those purposeful acts occurred within and/or were directed towards Texas.  The assumption of jurisdiction by this Court over the non-resident Defendants does not offend traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, a substantial part of the acts complained of herein occurred in this jurisdiction.

## Factual Allegations Common To All Counts

12.     Lorraine Warren and her late husband, Ed Warren ("Mr. Warren"), were paranormal investigators involved in thousands of paranormal investigations over the course of the last five decades.  Their investigations are part of approximately 8,000 case files compiled by Mrs. Warren and Mr. Warren over decades of paranormal investigations (collectively, the approximately 8000 case files are referred to as the "Case Files").  Mr. Warren passed away in August 2006.

13.     Mr. DeRosa-Grund is a motion picture producer and the Executive Chairman of Evergreen.

14.     Mr. DeRosa-Grund's dealings with Mrs. Warren and Mr. Warren date back nearly twenty-three (23) years.  Throughout that period, Mr. DeRosa-Grund held thousands of hours of discussions with Mrs. Warren and Mr. Warren regarding their Case Files.  Indeed, during those thousands of hours, Mr. Warren, in particular, would propose and discuss with Mr. DeRosa-Grund various Case Files that he felt were particularly suitable for exploitation as a theatrical motion picture.  During those discussions, Mr. DeRosa-Grund would take notes and, on occasion, tape record the discussions.

15.     At all times, the actual Case Files were held by Mr. Warren.

16.     The discussions between Mr. DeRosa-Grund and Mr. Warren and Mrs. Warren included, but were not limited to, the "Perron Farmhouse" Case File, the "Annabelle" Case File, and "The Enfield Poltergeist" Case File.

17.     Approximately fifteen (15) years ago, Mr. DeRosa-Grund and Mr. Warren specifically discussed the "Perron Farmhouse" Case File.  During this conversation, which was recorded, Mr. DeRosa-Grund revealed his strategy and vision to develop and produce a theatrical motion picture based on the "Perron Farmhouse" Case File.  It was this conversation, as reflected in the recording, and in particular Mr. DeRosa-Grund's strategy and vision, that ultimately developed into and became the basis for Mr. DeRosa-Grund's written story and treatment based on the "Perron Farmhouse" Case File, and that Mr. DeRosa-Grund sought to sell as part of a motion picture series under "The Conjuring" trademark that he had created (Later, it was the recording of Mr. DeRosa-Grund's conversation with Mr. Warren and Mr. DeRosa-Grund's strategy, vision, story and treatment that was used as the foundation of and basis for the hit theatrical motion picture that was entitled "The Conjuring" and released in 2013).

-4-

18.     In 2009, Mr. DeRosa-Grund and the Warrens entered into four agreements (the "Warren Agreements"), for the exploitation of the Life Stories of the Warrens and the Case Files. The Warren Agreements, entered into in Texas and Pennsylvania/Connecticut, were dated May 6, 2009, June 1, 2009 and June 19, 2009 (two agreements).   The Warren Agreements were executed: (i) by Mr. DeRosa-Grund on behalf of Evergreen Media Holdings, LLC ("Evergreen"); and (ii) either: (a) by Harrison Smith on behalf of Mrs. Warren and the Estate of Mr. Warren; or (b) by Mrs. Warren personally and by Mr. Smith on behalf of Mrs. Warren and the Estate of Mr. Warren.  The Warren Agreements gave Evergreen and Mr. DeRosa-Grund the exclusive right to exploit film and television rights in and to the Life Stories of the Warrens and in and to the Case Files.

19.     Mr. DeRosa-Grund worked with two screenwriters, Chad Hayes and Carey Hayes, to turn the recording of Mr. DeRosa-Grund's conversation with Mr. Warren and Mr. DeRosa-Grund's strategy, vision, and his original story and treatment into a "pitch" and, finally, a formal script.

20.     On or around March 29, 2010, Evergreen and New Line Production, Inc. ("New Line") entered into an Option Quitclaim Agreement, with a date as of November 11, 2009 (the Option Quitclaim Agreement is referred to herein as the "OQA").  Pursuant to the OQA, New Line acquired an option to purchase theatrical motion picture rights to an agreed upon, and very limited, selection of the Case Files, i.e., less than one percent (1%) of the Case Files, and to the Life Stories of the Warrens in conjunction therewith.  In particular, from the approximately 8,000 Case Files, under the terms of the OQA, New Line selected a limited number of Case Files, namely, just twenty-five (25) of the approximately 8,000, which included the "Perron

Farmhouse" Case File, the "Annabelle" Case File, and "The Enfield Poltergeist" Case File, which were reserved exclusively by New Line solely for the purposes of theatrical motion picture exploitation.   In exchange, New Line agreed to pay Mr. DeRosa-Grund and Evergreen a purchase price amount (the "Purchase Price"), and a percentage of the adjusted gross receipts of any motion picture made pursuant to the OQA.

21.     Evergreen and New Line also entered into a Producer Loanout Agreement on or around March 31, 2010, with a date as of November 11, 2009 (the Producer Loanout Agreement is referred to herein as the "Producer Agreement" (collectively the Producer Agreement and the OQA are referred to herein as the "Agreements"), for the producer services of Mr. DeRosa-Grund.  New Line agreed to engage and credit Mr. DeRosa-Grund as a producer in connection with any theatrical motion picture made pursuant to the Agreements, including, but not limited to, any theatrical motion picture associated with the "Perron Farmhouse" Case File, the "Annabelle" Case File, and the "The Enfield Poltergeist" Case File.

22.     New Line and Warner Bros. Entertainment, Inc. ("Warner Bros.") ultimately entered into a deal with Chad and Carey Hayes to write the script based on the "Perron Farmhouse" Case File, during which time New Line and Warner Bros. received copies of the recording of Mr. DeRosa-Grund's conversation with Mr. Warren and Mr. DeRosa-Grund's story and treatment as well as any and all notes and materials he possessed relating to the "Perron Farmhouse" Case file.   Accordingly, New Line and Warner Bros. were acutely and actually aware that: (i) Mr. DeRosa-Grund's original story and treatment were the underlying foundation of and basis for the screenwriters' work; and (ii) "The Conjuring" was the trademark that Mr.

DeRosa-Grund had single-handedly created for a series of productions based upon the Case Files and that "The Conjuring" trademark belonged exclusively to him.

23.     After entering into the OQA, Evergreen gave New Line permission to enter into a direct deal for any rights held by Mrs. Warren.  Evergreen agreed to an amendment of the OQA to allow for this new direct deal based on New Line's assurances that the OQA and Producer Agreement would remain the same and that Evergreen's rights and benefits under all of the aforementioned agreements would not change.   On that basis, the parties executed an "Amendment #1" to the OQA, entered into on or around February 7, 2011, with a date as of October 19, 2010 (Amendment #1 to the OQA is referred to herein as the "Amendment").

24.     Pursuant to the OQA, Amendment, and Producer Agreement, which were entered into in Texas and California, New Line produced the theatrical motion picture, which was titled "The Conjuring," based on the aforementioned "Perron Farmhouse" Case File.  Pursuant to the OQA, Amendment, and Producer Agreement, New Line paid Evergreen and Mr. DeRosa-Grund the initial Purchase Price for "The Conjuring" theatrical motion picture prior to commencing principal photography.  "The Conjuring" theatrical motion picture was released on or around July 19, 2013, and was hugely successful, grossing over $318,000,000 worldwide to date. With a production budget of approximately $20,000,000, "The Conjuring" theatrical motion picture has been reported to be one of the most profitable theatrical motion picture films of 2013.

25.     A separate action has been filed by Mr. DeRosa-Grund and Evergreen against New Line and Warner Bros. concerning the OQA, the Producer Agreement, and the Amendment.   The action, *Evergreen Media Holdings, LLC, et al. vs. Warner Bros. Entertainment, Inc., et al.*, is currently pending in the U.S. District for the Southern District of

Texas, Houston Division, case number 4:14-CV-00793.  This complaint is not an action under, related to, nor concerning the OQA, the Producer Agreement or the Amendment. Therefore the action at hand is totally separate and distinct from the aforementioned case number 4:14-CV-00793.

26.     Relevant to this Complaint, after releasing the "The Conjuring" theatrical motion picture, Evergreen and Mr. DeRosa-Grund believe and are informed that New Line and Warner Bros. have developed, produced and completed production on a motion picture production currently entitled "Annabelle," based on the "Annabelle" Case File.  In particular, it has been reported that the story line in Annabelle includes a demonic doll in the possession of the Warrens, which was described in the "Annabelle" Case File.  It has also been reported that production of "Annabelle" began on or about January 27, 2014.

27.     Additionally, Evergreen and Mr. DeRosa-Grund are informed and believe that New Line and Warner Bros. intend to produce a theatrical motion picture sequel to "The Conjuring," based upon "The Enfield Poltergeist" Case File. Specifically, New Line and Warner Bros. have already publically announced a release date of October 23, 2015 for the sequel as "The Conjuring 2: Enfield" and on March 27, 2014 registered that title with the Motion Picture Association of America ("MPAA").

28.     Evergreen and Mr. DeRosa-Grund are further informed and believe that New Line commissioned Chad and Carey Hayes to write the script for said sequel on or about July of 2013, said script is completed and New Line and Warner Bros. intend to commence principal photography on said sequel, i.e., "The Conjuring 2: Enfield", by the end of 2014.

29.     New Line and Warner Bros. have not provided any payment to Evergreen and Mr. DeRosa-Grund in connection with the underlying rights to produce another motion picture based on the Case Files.

30.     Furthermore, despite previously representing and agreeing that Mr. DeRosa-Grund would be a producer in connection with all projects based on New Line's selected Case Files, New Line and Warner Bros. have refused to engage Mr. DeRosa-Grund's producer services, to compensate him for the rights, or to provide him with a producer credit, or Evergreen corporate credit, in connection with "Annabelle," the anticipated sequel to "The Conjuring," i.e., "The Conjuring 2: Enfield," or any other prequel, sequel, remake, or spinoff of "The Conjuring."

31.     After learning that New Line and Warner Bros. intended to produce "Annabelle", Evergreen and Mr. DeRosa-Grund contacted New Line and Warner Bros. in or around January 2014 regarding payment to Evergreen of the Purchase Price for the production and development of the "Annabelle" Case File pursuant to the parties' Agreements.  Astonishingly, although New Line and Warner Bros. admitted that they were producing "Annabelle", New Line and Warner Bros. refused and continue to refuse to pay anything to Evergreen in connection with the production of "Annabelle."

32.     Despite the fact that the "Annabelle" Case File had previously been selected by New Line for exploitation, as one of the twenty five (25) limited Case Files which they were entitled to exploit **only** as a theatrically released feature film under the OQA, New Line and Warner Bros. based their refusal to pay upon the claim that they intended to produce "Annabelle" as a direct-to-video production, rather than a theatrical production for distribution in theaters, and that as such **the OQA did not apply**.

33.     Registration reports from the MPAA evidence that New Line registered the title "The Conjuring: Annabelle" on March 10, 2014, casting serious doubt on their claim that they plan to release "Annabelle" as a direct-to-video movie.  The MPAA does not register titles for direct-to-video productions. The MPAA only registers titles for theatrically released productions.

34.     Nevertheless, if, as New Line and Warner Bros. claim, the OQA does not apply to their direct-to-video production based upon the "Annabelle" Case File, then New Line and Warner Bros. have not been granted the contractual right to produce the direct-to-video production based upon the "Annabelle" Case File by Evergreen and Mr. DeRosa-Grund and any such action by them would be in violation of the rights which Evergreen and Mr. DeRosa-Grund exclusively secured from the Warrens under the Warren Agreements.

35.     In other words, any production based upon the "Annabelle" Case File - if not under the OQA - would be a violation of the rights of Evergreen and Mr. DeRosa-Grund under the Warren Agreements.

36.     Evergreen and Mr. DeRosa-Grund have learned that New Line and Warner Bros. intend to move forward and/or are already moving forward with production of a theatrical motion picture based upon "The Enfield Poltergeist" Case File, without the involvement of or compensation to Evergreen and/or Mr. DeRosa-Grund, i.e., in circumvention of the OQA, Amendment and Producer Agreement, despite the fact that "The Enfield Poltergeist" Case File had previously been selected by New Line for exploitation as the so-called sequel, "The Conjuring 2: Enfield."

37.     To the extent that New Line and Warner Bros. have not paid Evergreen for the rights to produce the so-called sequel, "The Conjuring 2: Enfield," New Line and Warner Bros.

are, self-evidently, again claiming that the OQA does not cover their production based upon "The Enfield Poltergeist" Case File. New Line and Warner Bros. have thus not been granted the contractual right to produce the production based upon "The Enfield Poltergeist" Case File by Evergreen and Mr. DeRosa-Grund and any such action by them would be in violation of the rights which Evergreen and Mr. DeRosa-Grund exclusively secured from the Warrens under the Warren Agreements.

38.     In other words, any production based upon "The Enfield Poltergeist" Case File - if not under the OQA - would be a violation of the rights of Evergreen and Mr. DeRosa-Grund under the Warren Agreements.

39.     Plaintiffs believe that New Line is attempting to justify their actions and to circumvent the OQA, Amendment and Producer Agreement by attempting to claim that their productions based upon the "Annabelle" and "The Enfield Poltergeist" Case Files are somehow based upon a parallel set of rights to those owned by Evergreen and Mr. DeRosa-Grund, namely, rights in connection with chapters from *The Demonologist* acquired from Mrs. Warren and/or Mr. Spera and Graymalkin Media, LLC ("Graymalkin Media").

40.     It is more than coincidental that James Wan ("Mr. Wan"), the director of "The Conjuring" theatrical motion picture, and listed by New Line as a producer of New Line and Warner Bros.' "Annabelle" and "The Conjuring 2: Enfield" theatrical motion pictures, is intimately aware of the content contained in *The Demonologist*, as well as an openly admitted huge fan of *The Demonologist*. Indeed, on or about November 29, 2011, Mr. Wan posted the following to his personal Twitter page: "I watch/read a lot of scary stories. But [f**k], THE DEMONOLOGIST, true life account of Ed & Lorraine Warren, is the scariest book I've read."

This statement demonstrates that New Line is purportedly relying on a parallel set of rights to those owned by Evergreen and Mr. DeRosa-Grund, namely, rights in connection with chapters from *The Demonologist* acquired from Mrs. Warren and/or Mr. Spera and Graymalkin Media. However, New Line does not possess any such rights.

41. On or about November 20, 1978, Mrs. Warren and Mr. Warren entered into, and executed, an agreement with Mr. Brittle concerning publishing rights, and certain ancillary rights related thereto, in and to a book entitled *The Demonologist*. The agreement was amended, and executed on or about April 16, 1990 (collectively, the agreement and the amendment are collectively referred to herein as the "Collaboration Agreement"). As set forth in the Collaboration Agreement, *The Demonologist* concerned Mrs. Warren and Mr. Warren's "lives and experiences as psychic investigators."

42. Among other things, in the Collaboration Agreement, Mrs. Warren, Mr. Warren, and Mr. Brittle agreed as follows:

> All contracts for the sale, lease, license or other disposition of any and all rights in to [*The Demonologist*] now existing or which may hereafter come into existence shall require the unanimous consent of [Mr. Brittle] and [Mrs. Warren and Mr. Warren].

43. The Collaboration Agreement is valid and existing and continues in full force and effect to the present day.

44. Following months of substantial work by Mr. Brittle, including, but not limited to, extensive interviews with Mrs. Warren and Mr. Warren, site-visits, testimonials, theological research and steps to vet the accuracy of *The Demonologist* by two Roman Catholic exorcists,

*The Demonologist* was first released in or about December 1980 by Prentice-Hall, Inc. ("Prentice Hall").

45.     *The Demonologist* focused on several experiences associated with Mrs. Warren and Mr. Warren.

46.     One experience which *The Demonologist* focused upon was entitled "Annabelle." As discussed in the relevant chapter of *The Demonologist*,  "Annabelle" involved a Raggedy Ann doll used by a demonic spirit that terrified a family.

47.     Another experience which *The Demonologist* focused upon was entitled "The Enfield Voices."  As discussed in the relevant chapter of *The Demonologist*, "The Enfield Voices" involved a single mother, Margaret Hodgson, who called police to her home in Enfield, England after two of her four children claimed that furniture was moving and knocking sounds were heard on walls.  A female police constable witnessed a chair slide across the floor on its own.  "The Enfield Voices" involved demonic voices, loud noises, thrown rocks and toys, overturned chairs and levitation of children.

48.     Since it was first released in 1980, by Prentice Hall, *The Demonologist* has been re-released several times, always pursuant to and in compliance with the terms of the Collaboration Agreement, including, most recently, in or about September 2002 through iUniverse.

49.     In or about June 2013, notwithstanding the long-existing Collaboration Agreement, Mr. Brittle received a telephone call from David Zindel ("Mr. Zindel"), the principal and owner of Graymalkin Media.  In the phone call, Mr. Zindel informed Mr. Brittle that Mr. Spera, Mrs. Warren's son-in-law, had "taken charge" of *The Demonologist* and would now

"change publishers" from iUniverse to Graymalkin Media.  Mr. Zindel further informed Mr. Brittle that he would send a contract to Mr. Brittle for his signature and represented that Mrs. Warren had **already** executed a contract with Graymalkin Media "changing publishers" for *The Demonologist* from iUniverse to Graymalkin Media.

50.     Among other things, Mr. Brittle correctly informed Mr. Zindel that Mr. Spera had no right or authority to "change publishers" in connection with *The Demonologist* in view of the Collaboration Agreement and, in particular, that the Collaboration Agreement requires the unanimous approval of both Mr. Brittle and Mrs. Warren **before** any action to "change publishers" can be taken with respect to *The Demonologist*.

51.     Notwithstanding the fact that in purporting to "change publishers" Mrs. Warren, Mr. Spera and Mr. Zindel had not been acting in compliance with the Collaboration Agreement, Mr. Brittle agreed to review the contract proposed by Mr. Zindel.  However, on or about June 22, 2013, Mr. Brittle rejected the proposed contract (as was his right).

52.     Over the ensuing months, Mr. Zindel aggressively pursued Mr. Brittle, including, but not limited to, sending him a letter on or about July 3, 2013, untenably saying, among other things, that "Mrs. Warren is free to exploit [*The Demonologist*] on a non-exclusive basis subject to her obligation to pay you your proportional share of the profits."  In other words, Mr. Zindel did not acknowledge the existence of the Collaboration Agreement, but rather, incorrectly claimed that Mrs. Warren could proceed as a copyright co-owner **without** Mr. Brittle's involvement (i.e., that Mrs. Warren merely had an obligation to account to Mr. Brittle regarding any monies she received).

-14-

53.     As a result, on or about August 3, 2013, Mr. Brittle spoke with Mrs. Warren directly and explained that the Collaboration Agreement, among other things, prohibits unilateral action by Mrs. Warren, or any of her agents, including Mr. Spera.  Instead of discussing the issue with Mr. Brittle, Mrs. Warren told Mr. Brittle to speak with Mr. Spera.

54.     Shortly after the conversation with Mrs. Warren, Mr. Spera responded to Mr. Brittle via e-mail on or about August 3, 2013.  In summary, Mr. Spera ignored the existence of the Collaboration Agreement and rejected the fact that Mr. Brittle's approval was required for any action to be taken to "change publishers" with respect to *The Demonologist*.

55.     On or about August 4, 2013, Mr. Brittle responded to Mr. Spera's e-mail.  In relevant part, Mr. Brittle noted the existence of the Collaboration Agreement.

56.     That same day, Mr. Spera responded and, in relevant part, acknowledged the existence of the Collaboration Agreement and the obligation upon Mrs. Warren and Mr. Brittle to unanimously agree to "change publishers" for *The Demonologist*, but then said: "Don't call [Mrs. Warren] again.  Don't e-mail me again.  You were made aware of the publishing deal.  You chose not [t]o participate.  It's now being handled by the publisher.  Send your petty correspondence to them."

57.     Meanwhile, in our about late July 2013, Mr. Zindel, in direct violation of the Collaboration Agreement and without Mr. Brittle's knowledge or consent, at least twice contacted the Author's Guild and informed the Author's Guild that Graymalkin Media was the "new publisher" of *The Demonologist*.  More specifically, Mr. Zindel attempted on two occasions, without Mr. Brittle's knowledge or permission, to have the Author's Guild send him all "permissions" related to *The Demonologist*.  Mr. Zindel fraudulently represented that he was

allowed to do this on the basis that Mrs. Warren controls two-thirds (2/3) of the copyright of *The Demonologist*. However, the Author's Guild was aware that *The Demonologist* was actually jointly and equally held and controlled by Mr. Brittle and Mrs. Warren insofar as Paragraph 8 of the Collaboration Agreement requires "unanimous consent" in order to take any action with respect to *The Demonologist*. Accordingly, the Author's Guild was aware that the actions requested by Mr. Zindel required **unanimous** permission of Mr. Brittle and Mrs. Warren and properly rejected the request. The Author's Guild, in turn, alerted Mr. Brittle to the fact that Mr. Zindel contacted the Author's Guild and that the request had been denied because Mr. Zindel could not provide Mr. Brittle's approval (such approval had, of course, never been given to Mr. Zindel).

58.     Mr. Brittle was advised by the Author's Guild to file a formal complaint, but Mr. Brittle elected not to do so. Instead, over the next several months, Mr. Brittle and Mr. Zindel discussed the possibility of a contract with Graymalkin Media concerning *The Demonologist*. Ultimately, however, Mr. Brittle and Mr. Zindel could not reach an agreement

59.     Inexplicably, without Mr. Brittle's approval, consent or knowledge, Mrs. Warren, Mr. Spera, and Graymalkin Media nevertheless moved forward and republished *The Demonologist* with Graymalkin Media as the "new publisher," in clear violation of the Collaboration Agreement, among other things.

60.     In an after-the-fact attempt to legitimize the actions of Mrs. Warren, Mr. Spera and Graymalkin Media, Mr. Zindel sent Mr. Brittle an email on April 10, 2014 in which he made false statements and assertions, to wit:

-16-

[Mrs. Warren's] side has told me that no collaboration agreement
was ever signed.

* * *

Even though [Mrs. Warren] owns 2/3 of the book according to US
Copyright law ...

61.     The effort by Mrs. Warren to try to claim that she never signed the Collaboration

Agreement is part of a fraudulent modus operandi that Mrs. Warren has sought to use in the past.

On December 9, 2009, Robert Unkel contacted Tony DeRosa-Grund and claimed that he had an

agreement with Mrs. Warren to act as her manager.  When questioned regarding Mr. Unkel's

claim, Mrs. Warren advised Mr. DeRosa-Grund and his legal representative in a telephone

conference call, that she had never signed an agreement with Mr. Unkel.  Mr. Unkel then

produced a copy of the signed agreement, and further added to his claim that he had paid a large

advance payment to Mrs. Warren; whereupon Mrs. Warren recanted and admitted that she had

signed the agreement, but claimed that she had never received any payment from Mr. Unkel.

Mr. Unkel then provided evidence of payment.  Whereupon Mrs. Warren recanted on this point

as well.

62.     Mrs. Warren's fraudulent claim that she did not sign the Collaboration

Agreement; refuted by the testimony of Judy Penney who is prepared to testify that she

witnessed the execution of the Collaboration Agreement by Mrs. Warren, Mr. Warren and Mr.

Brittle, and that she thereafter signed the Collaboration Agreement herself as a witness in their

presence.

63.     Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement

is untrue given the fact that Mr. Brittle is listed as the author of *The Demonologist* copyright and

Mrs. Warren's rights as a copyright claimant flow, if at all, via transfer through a "written agreement."   As such, if Mrs. Warren presses her fraudulent claim that she did not sign the Collaboration Agreement, she thereby admits that she has no claim in the copyright to *The Demonologist.*

64.     Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement is untrue given the fact that she accepted advances paid to her by the publisher on the original contract.

65.     Finally, Mrs. Warren's fraudulent claim that she did not sign the Collaboration Agreement is untrue given the testimony of a handwriting expert who will confirm that the signature on the Collaboration Agreement is, in fact, Mrs. Warren's signature.

66.     Mr. Zindel's claim that "[Mrs. Warren] owns two-thirds (2/3) of the book according to US Copyright law" is in conflict with the express terms of the Collaboration Agreement and false.

67.     In accordance with the terms of the Collaboration Agreement, rights in *The Demonologist* are owned and controlled on an equal basis by: (i) Mr. Brittle; and (ii) the Warrens, i.e.,  neither party can sell, lease, license or otherwise dispose of rights in and to *The Demonologist* without the permission of the other.

68.     Other than the limited publishing rights covered by the Collaboration Agreement, all other rights associated with the Case Files, as well as the life rights of Mrs. Warren and Mr. Warren, have been granted to Evergreen and Mr. DeRosa-Grund by the Warren Agreements.

69.     Mrs. Warren, and by extension Mr. Spera and Graymalkin Media, have no rights in connection with "*The Demonologist*" that can be exploited by New Line and/or Warner Bros. without Mr. Brittle's permission.

70.     Mr. Brittle has given no such permission to Mrs. Warren, Mr. Spera, Graymalkin Media, New Line and/or Warner Bros to further exploit "*The Demonologist.*"

71.     Moreover, Mrs. Warren, Mr. Spera, and Graymalkin Media, even if acting with Mr. Brittle, have no such rights which can be granted to New Line and/or Warner Bros inasmuch as all such rights have been granted by the Warrens to Evergreen and Mr. DeRosa-Grund under the Warren Agreements.

72.     Moreover, Mr. Brittle has previously granted an option to Evergreen to acquire his rights to further exploit "*The Demonologist*" (the "Demonologist Option"), which rights Evergreen acknowledges and agrees are exercisable if and only if Evergreen secures corresponding rights from Mrs. Warren.

73.     In other words, much like Mr. Zindel represented in his March 10, 2014 e-mail that, in view of Graymalkin Media's agreement with Mrs. Warren, no further exploitation of *The Demonologist* can occur without the involvement of Graymalkin Media, in view of Evergreen's Demonologist Option with Mr. Brittle, no further exploitation of "*The Demonologist*" can occur without the involvement of Evergreen.

74.     In sum, in view of the facts set forth herein, it appears that Mrs. Warren, Mr. Spera and/or Graymalkin Media, in addition to republishing *The Demonologist* in violation of the Collaboration Agreement, upon information and belief, have entered into an illegal agreement and/or otherwise assisted and/or are assisting New Line and Warner Bros. to illegally create,

produce and distribute a direct-to-video and/or a theatrical motion picture based on the "Annabelle" chapter in Mr. Brittle's *The Demonologist* publication as well as a theatrical motion picture based on "The Enfield Voices" chapter in Mr. Brittle's *The Demonologist* publication in violation of Evergreen and Mr. DeRosa-Grund's rights under the Warren Agreements.

75.     As a result of the aforesaid conduct, Plaintiffs have been -- and continue to be -- damaged.

<u>**COUNT I: TORTIOUS INTERFERENCE WITH CONTRACT**</u>
**(Evergreen and Mr. DeRosa-Grund Against Mrs. Warren, Mr. Spera and Graymalkin Media)**

76.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained herein above.

77.     At all relevant times, there were valid, existing contracts between Mr. Warren, Mrs. Warren, Mr. DeRosa-Grund and Evergreen (i.e., the aforementioned "Warren Agreements").  Upon information and belief, Mrs. Warren, Mr. Spera and Graymalkin Media knew of the existence of the Warren Agreements as well as the contents, terms and conditions thereof, but nevertheless interfered with the Warren Agreements.

78.     Among other things, Mrs. Warren, Mr. Spera and Graymalkin Media have interfered with the Warren Agreements by collaborating with New Line and Warner Bros. in connection with the producing and/or creating of direct-to-video and/or theatrical motion pictures based on the "Annabelle" and "The Enfield Voices" chapters as they appear in *The Demonologist*.

79.     Moreover, Mrs. Warren, Mr. Spera and Graymalkin Media have acted with malice and in conscious and deliberate disregard to the rights and/or interests of Evergreen and Mr. DeRosa-Grund.

80.     As a direct and proximate result of Mrs. Warren, Mr. Spera and Graymalkin Media's conduct, Evergreen and Mr. DeRosa-Grund have been damaged in an amount to be determined at trial.

## COUNT II: TORTIOUS INTERFERENCE WITH CONTRACT
### (Evergreen and Mr. DeRosa-Grund Against Warner Bros. and New Line)

81.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained herein above.

82.     At all relevant times, there was a valid, existing contract between Mr. Brittle and Evergreen and Mr. DeRosa-Grund, namely, the Demonologist Option.  Upon information and belief, Warner Bros. and New Line knew of the existence of the Demonologist Option, but they nevertheless interfered with the Demonologist Option.

83.     Among other things, Warner Bros. and New Line have interfered with the Demonologist Option by producing and/or creating direct-to-video and/or theatrical motion pictures based on content from *The Demonologist.*

84.     Moreover, Warner Bros. and New Line have acted with malice and in conscious and deliberate disregard to the rights and/or interests of Evergreen and Mr. DeRosa-Grund.

85.     As a direct and proximate result of Warner Bros. and New Line's conduct, Evergreen and Mr. DeRosa-Grund have been damaged in an amount to be determined at trial.

-21-

## COUNT III: COPYRIGHT INFRINGEMENT
### (Evergreen and Mr. DeRosa-Grund Against Warner Bros and New Line)

86.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

87.     As set forth herein, Evergreen and Mr. DeRosa-Grund own or are exclusively granted the right to exercise an option to exploit copyrights in *The Demonologist*.

88.     Warner Bros. and New Line's infringing acts are willful, intentional and purposeful in disregard of and with indifference to Evergreen and Mr. DeRosa-Grund's rights.

89.     Warner Bros. and New Line's infringing acts have been committed with prior notice and knowledge of Evergreen and Mr. DeRosa-Grund's rights.

90.     Accordingly, Warner Bros. and New Line are liable, jointly and severally, to Evergreen and Mr. DeRosa-Grund for copyright infringement pursuant to 17 U.S.C. §§ 101, 501, *et seq.*, and for damages in an amount to be proven at trial.  Evergreen and Mr. DeRosa-Grund are also entitled to Warner Bros. and New Line's profits attributable to the infringement, pursuant to 17 U.S.C. § 504, including an accounting of and a constructive trust with respect to such profits.  In the alternative, Evergreen and Mr. DeRosa-Grund are entitled to statutory damages pursuant to 17 U.S.C. § 504(c).  These statutory damages should be enhanced by 17 U.S.C. § 504(c)(2) because of Warner Bros. and New Line's willful infringement and conduct.

## COUNT IV: CONTRIBUTORY COPYRIGHT INFRINGEMENT
### (Evergreen and DeRosa-Grund Against Mrs. Warren, Mr. Spera and Graymalkin Media)

91.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

92.     As set forth herein, Evergreen and Mr. DeRosa-Grund own or are exclusively granted the right to exercise an option to exploit copyrights in *The Demonologist*.

93.     Mrs. Warren, Mr. Spera and Graymalkin Media's infringing acts are willful, intentional and purposeful in disregard of and with indifference to Evergreen and Mr. DeRosa-Grund's rights.

94.     Mrs. Warren, Mr. Spera and Graymalkin Media's infringing acts have been committed with prior notice and knowledge of Evergreen and Mr. DeRosa-Grund's rights.

95.     Mrs. Warren, Mr. Spera and Graymalkin Media contributed to Warner Bros. and New Line's infringing actions by falsely and illegally advising Warner Bros. and New Line that they could create and/or produce direct-to-video and/or theatrical motion pictures based upon the "Annabelle" and "The Enfield Voices" chapters as they appear in *The Demonologist*.

96.     Accordingly, Mrs. Warren, Mr. Spera and Graymalkin Media are liable, jointly and severally, to Evergreen and Mr. DeRosa-Grund for copyright infringement pursuant to 17 U.S.C. §§ 101,  501 *et seq*, and for damages in an amount to be proven at trial.  Evergreen and Mr. DeRosa-Grund are also entitled to Mrs. Warren, Mr. Spera and Graymalkin Media's profits attributable to the infringement, pursuant to 17 U.S.C. § 504, including an accounting of and a constructive trust with respect to such profits.  In the alternative, Evergreen and Mr. DeRosa-Grund are entitled to statutory damages pursuant to 17 U.S.C. § 504(c).  These statutory damages should be enhanced by 17 U.S.C. § 504(c)(2) because of Mrs. Warren, Mr. Spera and Graymalkin Media's willful infringement and conduct.

-23-

## COUNT V: BREACH OF CONTRACT
### (Mr. Brittle Against Mrs. Warren)

97.    Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

98.    The Collaboration Agreement (as amended) is a valid, binding and enforceable contract.

99.    Mr. Brittle has performed all of his obligations pursuant thereto, and all conditions for Mrs. Warren's performance have occurred.

100.    By engaging in the above-referenced conduct, including but not limited to, permitting Graymalkin Media to republish *The Demonologist* without Mr. Brittle's consent and/or approval, Mrs. Warren has breached the Collaboration Agreement.

101.    As a direct and proximate result of Mrs. Warren's breach, Mr. Brittle has been damaged in an amount to be determined at trial.

## COUNT VI: BREACH OF THE IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING
### (Mr. Brittle Against Mrs. Warren)

102.    Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

103.    There is implicit in every contract an implied covenant of good faith and fair dealing.  The Collaboration Agreement (as amended) contains an implied covenant of good faith and fair dealing under which the parties must refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of that bargain.

104.     Mr. Brittle has duly performed all covenants, conditions and promises required to be performed by them under the Collaboration Agreement in accordance with the terms and conditions, except for those obligations that have been prevented, delayed or excused by acts or omissions of Mrs. Warren.

105.     By permitting Graymalkin Media to republish *The Demonologist* without Mr. Brittle's consent and/or approval, Mrs. Warren has acted in bad faith and prevented Mr. Brittle from receiving the fruits of the bargain under the Collaboration Agreement.

106.     Accordingly, by engaging in the above-referenced conduct, Mrs. Warren has breached the implied covenant of good faith and fair dealing.  As a direct and proximate result of Mrs. Warren's breach, Mr. Brittle has been damaged in an amount to be determined at trial.

## COUNT VII: FRAUD
### (Mr. Brittle Against Mrs. Warren)

107.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

108.     The foregoing acts of Ms. Warren constitute fraud.

109.     Mrs. Warren has intentionally misrepresented to third-parties, namely, Mr. Zindel and Graymalkin Media, that she did not sign or enter into the Collaboration Agreement and, thereby, misrepresented to Mr. Zindel and Graymalkin Media that Mr. Brittle does not have certain rights related to *The Demonologist* -- rights he expressly has pursuant to the Collaboration Agreement.  The fact that such false and fraudulent misrepresentations were made was confirmed in the April 10, 2014 e-mail from Mr. Zindel to Mr. Brittle referenced herein above.

-25-

110.    The effort by Mrs. Warren to try to claim that she never signed the Collaboration Agreement is part of a fraudulent modus operandi that Mrs. Warren has sought to use in the past.

111.    Moreover, Mrs. Warren fraudulently concealed from Mr. Brittle the fact that she was seeking to change the publisher of *The Demonologist* from iUniverse to Graymalkin Media, as evidenced by the fact that she signed an agreement with Graymalkin Media prior to involving or otherwise advising Mr. Brittle of her actions.

112.    Accordingly, Mrs. Warren has committed fraud.

113.    Moreover, Mrs. Warren has acted with malice and in conscious and deliberate disregard to the rights and/or interests of Mr. Brittle.

114.    As a result of Mrs. Warren's fraud, Mr. Brittle has been damaged in an amount to be determined at trial.

## COUNT VIII: TORTIOUS INTERFERENCE WITH CONTRACT
### (Mr. Brittle Against Mr. Spera and Graymalkin Media)

115.    Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained herein above.

116.    At all relevant times, there was a valid, existing contract between Mr. Brittle and Mrs. Warren, namely, the Collaboration Agreement.  Mr. Spera and Graymalkin Media knew of the existence of the Collaboration Agreement as well as the contents, terms and conditions thereof, but Mr. Spera and Graymalkin Media nevertheless interfered with the Collaboration Agreement.

117.     Among other things, Mr. Spera and Graymalkin Media interfered with the Collaboration Agreement by re-releasing *The Demonologist* without "unanimous approval", namely, without Mr. Brittle's approval, as is required by the Collaboration Agreement.

118.     Moreover, Mr. Spera and Graymalkin Media have acted with malice and in conscious and deliberate disregard to the rights and/or interests of Mr. Brittle.

119.     As a direct and proximate result of Mr. Spera and Graymalkin Media's, Mr. Brittle has been damaged in an amount to be determined at trial.

## COUNT IX: COPYRIGHT INFRINGEMENT
### (Mr. Brittle Against Mr. Spera and Graymalkin Media)

120.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

121.     Mr. Brittle is an owner of *The Demonologist* copyright.

122.     Mr. Spera and Graymalkin Media's infringing acts are willful, intentional and purposeful in disregard of and with indifference to Mr. Brittle's rights.

123.     Mr. Spera and Graymalkin Media's infringing acts have been committed with prior notice and knowledge of Mr. Brittle's rights.

124.     Accordingly, Mr. Spera and Graymalkin Media are liable, jointly and severally, to Mr. Brittle for copyright infringement pursuant to 17 U.S.C. §§ 101, *et seq*. and for damages in an amount to be proven at trial.  Mr. Brittle is also entitled to Mr. Spera and Graymalkin Media's profits attributable to the infringement, pursuant to 17 U.S.C. § 504, including an accounting of and a constructive trust with respect to such profits.  In the alternative, Mr. Brittle is entitled to statutory damages pursuant to 17 U.S.C. § 504(c).  These statutory damages should be enhanced

by 17 U.S.C. § 504(c)(2) because of Mr. Spera and Graymalkin Media's willful infringement and conduct.

## COUNT X: TORTIOUS INTERFERENCE WITH CONTRACT
### (Mr. Brittle Against Warner Bros. and New Line)

125.    Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained herein above.

126.    At all relevant times, there was a valid, existing contract between Mr. Brittle and Mrs. Warren, namely, the Collaboration Agreement.  Upon information and belief, Warner Bros. and New Line knew of the existence of the Collaboration Agreement as well as the contents, terms and conditions thereof, but nevertheless interfered with the Collaboration Agreement.

127.    Among other things, Warner Bros. and New Line interfered with the Collaboration Agreement by exploiting chapters from *The Demonologist*, namely, the "Annabelle" and "The Enfield Voices" chapters.

128.    As a direct and proximate result of Warner Bros. and New Line's conduct, Mr. Brittle has been damaged in an amount to be determined at trial.

## COUNT XI: COPYRIGHT INFRINGEMENT
### (Mr. Brittle Against Warner Bros. and New Line)

129.    Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

130.    Mr. Brittle is an owner of *The Demonologist* copyright.

131.    Warner Bros. and New Line's infringing acts are willful, intentional and purposeful in disregard of and with indifference to Mr. Brittle's rights.

132.    Warner Bros. and New Line's infringing acts have been committed with prior notice and knowledge of Mr. Brittle's rights.

133.    Accordingly, Warner Bros. and New Line are liable, jointly and severally, to Mr. Brittle for copyright infringement pursuant to 17 U.S.C. §§ 101, 501, *et seq.*, and for damages in an amount to be proven at trial.  Mr. Brittle is also entitled to Warner Bros. and New Line's profits attributable to the infringement, pursuant to 17 U.S.C. § 504, including an accounting of and a constructive trust with respect to such profits.  In the alternative, Mr. Brittle is entitled to statutory damages pursuant to 17 U.S.C. § 504(c).  These statutory damages should be enhanced by 17 U.S.C. § 504(c)(2) because of Warner Bros. and New Line's willful infringement and conduct.

## COUNT XII: DECLARATORY JUDGMENT
### (Mr. Brittle Against All Defendants)

134.    Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

135.    An actual and justiciable controversy has arisen and now exists between Mr. Brittle and all of the Defendants concerning their respective rights in connection with *The Demonologist.*  Mr. Brittle has never given any of the Defendants authorization, consent and/or permission to exploit and/or otherwise use *The Demonologist* or any portion thereof for any purpose whatsoever.  Notwithstanding that fact, Defendants have exploited and/or otherwise used (and are exploiting and/or otherwise using) *The Demonologist* and/or portions thereof without Mr. Brittle's authorization, consent and/or permission.

136.     Accordingly, pursuant to 28 U.S.C. § 2201, Mr. Brittle is entitled to a declaratory judgment that none of the Defendants have any right and/or authority to exploit and/or use *The Demonologist*, including, but not limited to, any portion thereof, without the consent and/or approval of Mr. Brittle.

**COUNT XIII: CIVIL CONSPIRACY**
**(All Plaintiffs Against All Defendants)**

137.     Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

138.     Defendants, acting in concert and in furtherance of a conspiracy, have acted together to interfere with the Collaboration Agreement, the Warren Agreements and the Demonologist Option in order to deprive Plaintiffs of their rights.

139.     Together, in furtherance of the conspiracy, Defendants have committed the acts complained of herein.

140.     As a proximate result of Defendants' conduct, Plaintiffs have been damaged.

**RELIEF**

WHEREFORE, Plaintiffs, EVERGREEN MEDIA HOLDINGS, LLC, TONY DEROSA-GRUND and GERALD D. BRITTLE, respectfully request that the court grant the following relief against Defendants, LORRAINE WARREN, TONY SPERA, GRAYMALKIN MEDIA, LLC, WARNER BROS. ENTERTAINMENT, INC. and NEW LINE PRODUCTIONS, INC., as follows:

1.     Awarding Plaintiffs actual damages;

2.     Awarding Plaintiffs punitive damages in an amount set by the trier of fact;

3.     Awarding Evergreen and Mr. DeRosa-Grund damages for tortious interference with a contract by Mrs. Warren, Mr. Spera and Graymalkin Media and by Warner Bros. and New

-30-

Line;

4.      Awarding Evergreen and Mr. DeRosa-Grund damages pursuant to 17 U.S.C. §§ 101, 501, *et seq.* for copyright infringement by Warner Bros. and/or New Line;

5.      In addition to Evergreen and Mr. DeRosa-Grund's actual damages, awarding Evergreen and/or Mr. DeRosa-Grund the profits made by Warner Bros. and/or New Line from their wrongful acts pursuant to 17 U.S.C. § 504;

6.      In the alternative, awarding Evergreen and/or Mr. DeRosa-Grund statutory damages pursuant to 17 U.S.C. § 504(c), as well as enhanced statutory damages pursuant to 17 U.S.C. § 504(c)(2);

7.      Awarding Evergreen and Mr. DeRosa-Grund damages pursuant to 17 U.S.C. §§ 101, 501, *et seq* for contributory copyright infringement against Mrs. Warren, Mr. Spera and Graymalkin Media;

8.      In addition to Evergreen and Mr. DeRosa-Grund's actual damages, awarding Evergreen and/or Mr. DeRosa-Grund the profits made by Mrs. Warren, Mr. Spera and Graymalkin Media from their wrongful acts pursuant to 17 U.S.C. § 504;

9.      In the alternative, awarding Evergreen and/or Mr. DeRosa-Grund statutory damages pursuant to 17 U.S.C. § 504(c), as well as enhanced statutory damages pursuant to 17 U.S.C. § 504(c)(2) for contributory infringement against Mrs. Warren, Mr. Spera and Graymalkin Media;

10.     Awarding Mr. Brittle damages for breach of contract by Mrs. Warren;

11.     Awarding Mr. Brittle damages for breach of the implied covenant of good faith and fair dealing by Mrs. Warren;

12.     Awarding Mr. Brittle damages for the fraudulent conduct of Mrs. Warren;

13.     Awarding Mr. Brittle damages for tortious interference with a contract by Mr. Spera, Graymalkin Media, Warner Bros., and New Line;

14.     Awarding Mr. Brittle damages pursuant to 17 U.S.C. §§ 101, 501 *et seq.* for copyright infringement by Mr. Spera , Graymalkin Media, Warner Bros., and/or New Line;

15.     In addition to Mr. Brittle's actual damages, awarding Mr. Brittle the profits made by Mr. Spera, Graymalkin Media, Warner Bros., and/or New Line from their wrongful acts pursuant to 17 U.S.C. § 504;

16.      In the alternative, awarding Mr. Brittle statutory damages pursuant to 17 U.S.C. § 504(c), as well as enhanced statutory damages pursuant to 17 U.S.C. § 504(c)(2);

17.      Entering a declaratory judgment that none of the Defendants have any right and/or authority to exploit and/or use *The Demonologist*, including, but not limited to, any portion thereof, without the authorization, consent and/or permission of Mr. Brittle.

18.      Awarding Plaintiffs damages for civil conspiracy by Defendants;

19.      Awarding an accounting to Plaintiffs for the gains and profits of Defendants and all damages sustained by Plaintiffs by reason of Defendants' unlawful acts as alleged herein pursuant;

20.      Awarding the maximum pre-judgment and post-judgment interest as allowed by law;

21.      Awarding Plaintiffs their attorneys' fees and cost, including, but not limited to, attorneys' fees and costs pursuant to 17 U.S.C. § 505;

22.      Enjoining and restraining Defendants from: (i) further publication of *The Demonologist* permanently without the permission of Mr. Brittle; and/or (ii) proceeding with development and production of a direct-to-video and/or theatrical motion picture based upon either the "Annabelle" or "The Enfield Voices" chapters in *The Demonologist*;

23.      Awarding Plaintiffs any other remedy to which they may be entitled to as provided under applicable federal or state law; and

24.      Awarding Plaintiffs such other and further relief as the Court might deem proper.

## **Jury Demand**

Plaintiffs hereby demand a jury trial on issues so triable pursuant to Rule 38 of the

Federal Rules of Civil Procedure.

Respectfully submitted,


By:_____/s/ Sanford L. Dow_____
        Sanford L. Dow
        S.D. Texas No. 17162
        Texas Bar No. 00787392
        Nine Greenway Plaza, Suite 500
        Houston, Texas 77046
        (713) 526-3700/FAX (713) 526-3750
        dow@dowgolub.com

        ATTORNEY-IN-CHARGE FOR PLAINTIFFS


OF COUNSEL:

DOW GOLUB REMELS & BEVERLY, LLP
Stephanie A. Hamm
S.D. Texas No. 108779
Texas Bar No. 24069841
Nine Greenway Plaza, Suite 500
Houston, Texas 77046
(713) 526-3700/FAX (713) 526-3750
sahamm@dowgolub.com

GRIMES LLC
Charles W. Grimes
Connecticut Juris No. 304368
(to be admitted pro hac vice to S.D. Texas)
grimes@gandb.com
Michael R. Patrick
Connecticut Juris. No. 423632
(to be admitted pro hac vice to S.D. Texas)
patrick@gandb.com
488 Main Avenue
Norwalk, Connecticut 06851
Tel: (203) 849-8300/FAX: (203) 849-9300


N:\users\SDow\DeRosa-Grund\Evergreen Media Group, LLC\Brittle\Plaintiffs' Original Complaint.doc